**FRIENDS FOR ALL CHILDREN, INC., as legal guardian and next friend of the named 150 infant individuals, et al., Plaintiff,**

v.

**LOCKHEED AIRCRAFT CORPORATION, Defendant and Third-Party Plaintiff,**

v.

**The UNITED STATES of America, Third-Party Defendant.**

Civ. A. No. 76–0544.

United States District Court, District of Columbia.

June 13, 1983.

As Corrected June 16, 1983.

J. Vernon Patrick, Jr., Berkowitz, Lefkovits & Patrick, Birmingham, Ala., Oren R. Lewis, Jr., Lewis, Wilson, Lewis & Jones, Ltd., Arlington, Va., for plaintiffs.

Carroll E. Dubuc, Finley, Kumble, Wagner, Heine, Underberg & Casey, Washington, D.C., for defendant and third-party plaintiff.

Mark A. Dombroff, Director, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for third-party defendant.

Charles R. Work, McDermott, Will & Emery, Washington, D.C., guardian ad litem.

## MEMORANDUM

OBERDORFER, District Judge.

### I. Introduction

On August 28, 1982, the Court approved a Stipulation of Compromise Settlement resolving the claims of 45 infant plaintiffs who alleged that they suffered compensable injury when a C-5A military transport airplane, designed and built by Lockheed Aircraft Corporation and operated by the United States Air Force, crashed near Saigon, Vietnam, on April 5, 1975. In return for the dismissal of these 45 claims and of a related motion for sanctions arising from alleged discovery abuse by defendants, defendants paid into the Registry of the Court the total sum of $13,500,000.[1] The amounts and timing of disbursements from this recovery to the individual plaintiffs and to plaintiffs' counsel and the guardian ad litem for fees and expenses were left solely to the discretion of this Court, with the proviso that

it is the intent of this agreement that the net proceeds of this compromise settlement inure solely to the benefit of the American plaintiffs [participating in the settlement] . . . . Awards, distributions, etc. to the Guardian ad litem for fees, costs or expenses (past and future) shall be limited to amounts directly related to activities performed on behalf of one or more of the American plaintiffs . . . pursuant to the guidelines set forth by the Court of Appeals in Schneider v. Lockheed, 658 F.2d 835 (D.C.Cir.1981). None of these funds are to be allocated or used in any way whatsoever for litigation expenses, offsets, or advances for any other cases not covered by this Stipulation of Compromise Settlement.

On July 26, 1982, plaintiffs' counsel, in anticipation of final approval of the settlement agreement by the Deputy Attorney General and the Court, filed several motions seeking disbursement of the settlement proceeds in the following proportions:

1. 33⅓% directly to the guardians of the individual plaintiffs, free of trust;

2. 16⅔% to a central trust;

3. 33⅓% to attorney fees;

4. 3⅓% to the guardians ad litem for their fees and expenses; and

5. 13⅓% to litigation expenses.

This allocation of the settlement recovery was also recommended by the guardian ad litem in his Report and Recommendation filed August 25, 1982.

On February 16, 1983, the Court authorized payment of $100,000, free of trust, to each individual plaintiff who submitted to the Court a proposed order, signed by that plaintiff's locally appointed guardian and representing that the funds would be administered in accordance with local law. On May 3, 1983, the Court gave its approval to the creation of a central trust to provide additional funds to those plaintiffs who, over time, prove to be in need of greater medical assistance. The time has now come for the Court to turn its attention to final payments to plaintiffs' counsel and the guardians ad litem for their fees and expenses.[2] Interim payments for these items from the global settlement have been made from time to time over the last few

---

1. This settlement has been referred to by the parties as the "global settlement." In other related cases, a total of $3,953,608.90 has been recovered for the benefit of other infant plaintiffs who were on the airplane when it crashed. The cases of 64 other infant plaintiffs are still pending.

2. This Memorandum concerns only that portion of the fees and expenses of this litigation that are allocated to the cases that have been settled. Additional fees and expenses have been incurred on behalf of the plaintiffs whose cases have not yet been settled. Those amounts will be paid, as appropriate, from whatever recovery, if any, is eventually received by those plaintiffs.

months,[3] but the Court has withheld final payment for these items pending further submissions from the guardians *ad litem* on the subject of their fees and expenses and the Final Report of the Special Masters appointed to examine the litigation expenses.[4] For the reasons explained below, the Court authorizes payments for fees and expenses in the amounts described on pp. 817 and in Table 12.

## II. The Litigation and Global Settlement

The original action in this litigation was filed by the firm of Lewis, Wilson, Jones and Lewis in 1975 on behalf of Friends for All Children ("FFAC") as personal representative of the 150 infants who survived the crash. The complaint sought both compensatory and punitive damages. At that time, the Lewis firm quoted to FFAC the firm's normal contingent fee of one-third of any recovery; if there were no recovery, the Lewis firm would earn no fee. The clients would be responsible for expenses.

In 1978, the Lewis firm associated the firm of Berkowitz, Lefkovits & Patrick of Birmingham, Alabama. Thereafter, in late 1978, the Court appointed Charles Work, Esq., as *amicus curiae* to advise about the propriety of certain communications from the Lewis firm to the parents of the children. Those communications recommended that individual parents substitute for FFAC as plaintiffs' legal representatives, while continuing to retain the Lewis firm as counsel. Thereafter, the Court appointed Mr. Work and his firm as guardian *ad litem* with the responsibility, among others, of establishing communications with the plaintiffs' adoptive parents, many of whom were residents of European countries. The guardian carefully drafted a letter designed to give each parent a fair description of the lawsuit brought by FFAC and the prospects and risks of participating. The letter offered further consultation with any parent who had questions not answered by the letter.

The guardian *ad litem*'s letter to the parents included a statement that the Lewis firm had agreed to represent each plaintiff for a contingent fee not to exceed one-third of any recovery, with the understanding that each plaintiff would be responsible for any expenses incurred in the prosecution of the lawsuit. The letter explained the fee agreement in the following terms:

(c) *Counsel Fees:* In the United States although other fee arrangements can be made, suits for personal injury or wrongful death are typically handled by attorneys on a contingent fee basis. This means that the attorney receives no compensation for legal services rendered unless there is a recovery. If there is no recovery, the court costs and litigation expenses advanced by the attorney for that case must be borne by the client. The contingent fees charged by attorneys handling such claims typically vary from approximately 20 percent to 40 percent of the recovery. In this case, all applications for attorney fees and reimbursements of costs and expenses would be subject to court approval, after a hearing, of which you would be given notice, and at which you would have a right to be heard with respect to the reasonableness of the request for fees, expenses, and costs.

Based on their evaluation of the prospects for success in this litigation, the Lewis firm initially agreed with FFAC when this suit was filed and subsequently has agreed with me as guardian that it would prosecute this litigation seeking a recovery for the children on a contingent fee arrangement, on the understanding that the firm would not request a fee in excess of one-third of any recovery. The Lewis firm would presumably have a right to be

---

**3.** Plaintiffs' counsel have received $1,320,000 in interim fee payments from the global settlement and $810,000 in interim payments for litigation expenses. The guardians *ad litem* have received $587,918.97 from the global settlement for their fees and expenses.

**4.** *See* p. 802, *infra*.

compensated for its services to date out of any recovery, if you retain other attorneys to represent your child's interest in prosecuting your child's claim from this point forward.

Report of the Guardian ad litem, October 12, 1979; Affidavit of Oren R. Lewis, Jr., October 25, 1982, p. 2.

In 1979, when these preliminary matters were resolved and the guardian *ad litem* was in place, defendants entered into an agreement with plaintiffs and the guardian *ad litem* pursuant to which plaintiffs dismissed their claim for punitive damages in exchange for a payment by defendants to the guardian *ad litem* of $5,000 for each child's medical care and legal expenses [5] and an agreement by defendants not to contest the jurisdiction of the court, to conduct discovery in the District of Columbia, and to pay 30 percent of any jury verdict without appeal.[6] Defendants admitted liability for the crash, and the sole issue for trial, according to the agreement, was what damages, if any, were due the individual plaintiffs.

These express commitments in the 1979 agreements settling liability gave hope, if not promise, that the cases could be disposed of expeditiously. The plaintiffs were all about the same age and had shared a common experience, both before and after the crash. There was medical testimony that an unusually large number had symptoms common to a single syndrome, Minimum Brain Dysfunction ("MBD"). The Court expected that it would be a relatively simple matter to adduce expert testimony as to the cause and extent of any injury suffered in two or three typical cases. Jury verdicts on those cases should have provided

parties and counsel, litigating and negotiating in good faith, an adequate basis for quick settlement of the remaining cases. Settlements had been the result in the many cases involving adult, United States citizen victims of the crash. Contrary to this expectation, however, instead of brief, administrative-like hearings to resolve what was thought to be a relatively simple medical/legal issue, there erupted one of the most protracted, costly, and unpleasant litigations in the history of this district.

In the Spring of 1980, this Court tried three bellwether cases seriatim to the same jury. Contrary to the Court's expectations, each trial consumed three full weeks, as defendants vigorously contested the plaintiffs' claim that the damages they had incurred were proximately caused by the accident. The jury awarded $500,000 to one plaintiff and $1,000,000 to another. After a settlement of one issue in the third case outside the presence of the jury, the jury returned a verdict for defendant that the Court later set aside; on retrial another jury returned a verdict of $400,000 for that plaintiff. After these verdicts, however, the parties continued to be unable either to settle or to agree upon streamlining trial of the remaining cases, and it became apparent that trying them would require the services of several judges over a period of several years. Accordingly, this Court conducted hearings about the plaintiffs' entitlement to funds for medical help before their cases could be reached for trial. Following these hearings, trial counsel for the parties negotiated a settlement to establish a trust to provide for the immediate needs of the children. These efforts to provide interim payments were ultimately frustrat-

---

**5.** Defendants agreed to pay $5,000 to the "Guardians' Fund" for every individual case in which an amended complaint was filed. One hundred fifteen amended complaints have so far been filed. Fifty-one of those cases are those of American plaintiffs who have now settled their claims. The case of one American plaintiff, Carly Kurth, is set for trial on September 19, 1983. The remaining sixty-three plaintiffs are non-U.S. residents whose cases are

awaiting decision by the Court of Appeals on an appeal of an order denying defendant's motion to dismiss on grounds of *forum non conveniens*.

**6.** In addition, the Government agreed to indemnify Lockheed for an undisclosed portion of any payments it made on judgments awarded to plaintiffs or in settlement of plaintiffs' claims.

ed in 1980 and 1981 at the policy level of the Department of Justice, where the tentative settlement agreement suffered long delays and ultimate rejection.

The Court, assisted by counsel, developed a comprehensive pretrial order providing a form of collateral estoppel built upon the experience of the bellwether trials, attempted to complete pretrial of the domestic cases, and arranged for their distribution by the Calendar Committee among all the judges of this Court for trial on an expedited basis in accordance with the comprehensive pretrial order. Plaintiffs pressed for trial of the reassigned cases without awaiting the results of appeals from the bellwether judgments in the hope that this would enable the guardian *ad litem* to obtain funds sufficient to continue the litigation despite the heavy cost of the attrition defense mounted by Lockheed and the United States.

In May 1981, the Court of Appeals set aside the verdicts in the bellwether cases and disapproved of collateral estoppel as a means of streamlining the remaining trials. *Schneider v. Lockheed Aircraft Corporation,* 658 F.2d 835 (D.C.Cir.1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). Recognizing that this action would "in practical terms, require the retrial of several cases," the Court of Appeals expressed "our hope that the setting forth of our views . . . will speed these cases to swift and proper resolution." *Id.* at 837.

Responding to that expression, the District Court *en banc* scheduled one of the remaining cases of United States resident plaintiffs (the "American cases") for trial each month beginning January 1, 1982, with the general understanding that an assigned judge would try a case each month. As a result, the parties settled several cases on the eve of their scheduled trials, and the proceeds of these settlements were distrib-uted to the individual plaintiffs, to counsel for fees and expenses, and to a set-aside for the guardian *ad litem.*

The comprehensive pretrial order had limited plaintiffs' use of photographs of the crash scene in an effort to contain the potential of some of them to inflame juries. When the Court of Appeals struck down the collateral estoppel elements of that order, such photographs assumed an increased value to plaintiffs. Plaintiffs' counsel renewed efforts to locate and to obtain production of more photographs of the crash scene than the handful that defendant and the United States had produced in response to earlier discovery demands unsupported by court orders to produce. When the United States attempted to avoid these renewed requests, plaintiffs persisted. In September 1981, as counsel were preparing for retrial of one of the bellwether cases, the United States belatedly discovered approximately 1,000 photographs of the crash scene and wreckage and other documents that had been requested at the outset of discovery but had not been produced previously. Plaintiffs then filed, and from time to time supplemented, a motion for sanctions against defendants and launched a substantial discovery program in support of the motion. Shortly thereafter, the pending bellwether case was settled on the eve of retrial, but after jury selection, for $850,-000. At about the same time, defendants increased their offer to settle the balance of the cases of United States resident plaintiffs to a "non-negotiable" sum of $300,000 each, provided that all of the United States plaintiffs agreed. After protracted negotiations, some of which were conducted on the record by two judges of this Court, the guardian was unable to recommend the offer as sufficient, and defendants were unwilling to enhance it.[7]

In late 1981, discovery resumed, including depositions of new expert witnesses to in-

---

7. At that time, the guardian was of the opinion that $250,000 per child, after fees and expenses, would be required to meet the medical and other needs of the children. *But see* p. 813, *infra.*

terpret the substantial new evidence produced by the defendants and depositions of government officials responsible for the preservation and production of the formerly missing documents.

In the first case tried in 1982, the Court refused to permit plaintiffs to present evidence to the jury supporting an adverse inference from defendants' delayed production of the photographs and other documents. The jury returned a verdict for defendant. *Kurth v. Lockheed Aircraft Corp.,* Civil Action No. 80–3223.[8] Shortly thereafter, this Court held an evidentiary hearing on the plaintiffs' motion for sanctions and received extensive briefs from all parties. In the meanwhile, for various reasons, other trials scheduled pursuant to the *en banc* order were continued by the several judges responsible for them. In June 1982, this Court deferred decision on the pending motion for sanctions on a representation that the parties were on the verge of a global settlement of all the "American" cases. Finally, after much backing and filling, trial counsel entered a Stipulation of Compromise Settlement on August 4, 1982. It was approved by the Deputy Attorney General on August 24, 1982, and by this Court on August 28, 1982. In approving the settlement, the Court wrote:

> Upon the entire record, and for reasons, *inter alia,* those stated in the Guardian Ad Litem's Report and Recommendation dated August 25, 1982, including the reference on page 23 to repayment to foreign plaintiffs, and with a view to early attention to their claims, the foregoing Stipulation of Compromise is approved.

Meanwhile, during various phases of this litigation, the parties had settled six other individual cases for amounts ranging from $300,000 to $1,000,000. In addition, the plaintiffs in the three bellwether cases received, pursuant to the stipulation with de-

fendants, 30% of their judgments despite the appeal that later overturned those judgments. The allocation of the proceeds of those settlements and partial judgments among the plaintiffs, their counsel (for fees and expenses), and the guardian *ad litem* (for fees and expenses) is laid out in Table 1.

### III. Fees and Expenses of the Guardians *Ad Litem*

The history of the appointment and activities of the guardians *ad litem* has been fully discussed in the Court's Memorandum on Payments to the Guardians Ad Litem for Fees and Expenses Incurred on Behalf of U.S. Resident Plaintiffs (filed March 11, 1983). Mr. Work, who is the principal guardian *ad litem,* and his law firms (originally Peabody, Lambert & Meyers, now McDermott, Will & Emery) have served as guardians *ad litem* for all the infant plaintiffs in this litigation since 1979. As stated in the Memorandum of March 11, 1983, Mr. Work has been tireless in his dedication to the interests of his wards. Mere money can never compensate fully for the value and example of his service.

The guardians *ad litem* have received payment from a number of sources over the years, including partial judgments received in the bellwether cases, in which their fees and expenses were taxed as costs against defendant,[9] payments from the individually settled cases, and interim payments from the global settlement. In its Memorandum of March 11, 1983, the Court tentatively disapproved a portion of the fees claimed by the guardians for the American cases for lack of sufficient documentation. Using a formula suggested by the guardians themselves, the Court allocated 80% of the guardians' time through December 1982 to the settled cases and 20% of the time to the foreign cases and *Kurth.* The guardian was therefore authorized a total fee of $713,618.27 for the settled American cases.

---

**8.** A motion for new trial in that case was granted on February 1, 1983.

**9.** This mode of payment was approved as a general principle by the Court of Appeals in *Schneider,* 658 F.2d at 854–55.

However, the Court set aside an additional amount of the settlement recovery in the Registry for 30 days to permit the guardians to supplement the documentation underlying their fee application.

The guardians have now filed a supplement to their fee application which purports to provide the information necessary for a further fee award from the settlement recoveries. While this supplementary submission does indeed provide more detailed information supporting the fee application, the Court still does not find sufficient support for the full amount claimed by the guardians.[10]

As the Court explained fully in its Memorandum of March 11, 1983, allocation of the guardians' time between settled and nonsettled cases is crucial to any fee award. Such an allocation is clearly required by the express terms of the Stipulation of Compromise Settlement. The importance of this type of allocation was also recognized in *Schneider,* when the Court of Appeals stated that "for all services rendered from the date of this judgment forth, the guardian should be required to show that the particular plaintiff had need of the particular services for which the guardian seeks a fee." 658 F.2d at 855.

Defendant has consistently argued that this language requires the Court to make payments to the guardian only for fees and expenses that can be specifically allocated to a particular plaintiff. As the Court noted in its Memorandum of March 11, 1983, that interpretation of the *Schneider* dictum is neither fair to the language and clear intent of the Court of Appeals nor reasonable in the context of this group litigation, where many of the guardian's activities have been on behalf of groups of plaintiffs. Even time that was apparently expended on behalf of one plaintiff alone was frequently of benefit to others and should properly be shared by them as well.

■ Defendants are correct, however, in their assertion that the documentation supporting the guardians' fee applications has been consistently below the quality anticipated by the Court of Appeals and this Court.[11] Most notably, contemporaneous time sheets attached to the affidavits make no attempt to indicate how much time specifically was allocated to particular activities. In nearly all cases, several different activities are grouped together and allocated to large blocks of time. It is often impossible to determine which plaintiffs were involved in certain activities, such as conferences with plaintiffs' counsel or review of pleadings. Overall, it is impossible for the Court to determine from these documents the proper allocation of the guardians' time, even for time that *should* be clearly allocable to particular plaintiffs.

The guardians have been given notice in the past of the need for more precise allocation of their time. The Court has more than once required the guardians to submit supplementary documentation providing some kind of allocation. Yet such supplemental documentation is clearly *post facto* and therefore of less probative value than contemporaneous records. The guardians have never maintained detailed contemporaneous records that would make more precise allocation possible. When this problem

---

**10.** There has never been any question that the guardians have in fact expended the hours and expenses they claim. The sole difficulty has been in determining the precise activities upon which those items of time and disbursements were expended.

**11.** *Cf. National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982) (documentation required for attorney fee application under fee award statute). The Court has several times expressed its intention to apply this Circuit's standards for attorney fee applications to the fees of the guardians *ad litem* in this case. The attorney fee analogy is especially appropriate in this case because (1) the guardians are in fact attorneys and their fee applications are based upon the kinds of time charges they would submit to fee-paying clients, and (2) much of the work of the guardians was legal or quasi-legal in nature.

is added to the intrinsic allocational difficulty in this case, it creates a nearly insurmountable problem for the guardian and for the Court in complying with the spirit of *Schneider* and with the requirements of certain agreements, such as the Stipulation of Compromise Settlement, which require the Court to impose some kind of allocation on the guardians' fee requests.

To date, the Court has done its best with the documents supplied by the guardian *ad litem*. In keeping with the spirit of *Parker v. Lewis,* 670 F.2d 249 (D.C.Cir.1982), the Court has authorized interim payment as promptly as possible for all amounts that are clearly "incontestible" as to both amount and allocation to the source from which payment is sought. In making these payments, the Court has relied upon the information supplied by the guardians, the submissions on the subject of guardians' fees filed by defendants, and the Court's own knowledge of events in the case and of the guardians' involvement in them.

■ However, the guardians have now had ample notice, both from *Schneider* and this Court's opinions in this case and from the recent attorney fee opinions in this circuit, of what is required in an acceptable fee application. From this date forward, therefore, the guardian will be paid only for time that is clearly supported by time sheets, preferably contemporaneous, that indicate:

1. the specific amount of time spent on any particular activity, and

2. the particular plaintiffs or group of plaintiffs involved.[12]

As for the present fee application of the guardians, it is clear that the time allocation in their most recent submission, which they admit depends upon generalized, *post*

*facto* estimates, is far from precise. It is difficult for the Court to determine the extent to which this imprecision is due to the inherent problems in allocating abstract benefits to groups of plaintiffs who realize those benefits, if at all, at vastly different times, and the extent to which the imprecision is due to the faulty documentation of the guardians. To the extent that it is the former, estimation is permissible as providing the only reasonable basis for payment of fees that are without question owing from *some* source. On the other hand, to the extent that the problem is due to the guardians' own procedures, the guardians alone should bear its burden.

■ Overall, the Court is satisfied that, with the exceptions noted below, approximately 95% of the allocation provided by the guardians is essentially correct and supported by sufficient documentation to warrant payment. However, the guardians have not presented evidence sufficient to support the remaining 5% of their allocation. The Court will therefore disallow 5% of the total fee claimed as insufficiently proven. The balance will be paid to the guardians from the sources to which it is allocated.

It should be noted that this 5% is not a "negative multiplier" of the type authorized and advocated in the attorney fee cases. It does *not* constitute a penalty for any insufficiencies in the guardian's performance in the case. As the Court noted in its Memorandum of March 11, the guardians, in keeping with their tireless dedication to the best interests of their wards, have expressly disavowed any claim to an upward adjustment in their fee for risk, quality of service, or any other factor. In that Memorandum, the Court expressly found that no downward adjustment for such factors was ap-

---

12. *See Schneider,* 658 F.2d at 855; Memorandum of March 11, 1983, at 5–6, 8–11. This does not mean, of course, that contemporaneous time sheets must predict every plaintiff or group of plaintiffs who will ultimately benefit from a particular activity. However if the guardian is claiming time for a settlement negotiation meeting, a discussion with plaintiffs' counsel, or a conference with parents, the names of the plaintiffs directly involved should be indicated.

propriate. The 5% disallowance here merely reflects a failure of proof in the guardians' fee application.

■ There are three categories in the guardians' most recent submission in which the Court finds the guardians' allocation of time between groups of plaintiffs to be incorrect. First, the guardians suggest that 80% of their time spent on settlement negotiations should be allocated to the settled cases and 20% allocated to the nonsettled cases. Although it may be true that the experience in earlier negotiations may ultimately be of some benefit in future settlement negotiations, that benefit has obviously not yet been felt by any of those plaintiffs, and there is no guarantee that it will be felt to any appreciable extent in the future. The nonsettling plaintiffs have been allocated a portion of the costs of many activities of the guardians that had a role in developing the common negotiating strategy for these cases. The guardians have not shown that the time actually spent in individual negotiations in particular cases resulted in any additional significant benefit to the plaintiffs whose cases are still pending. Accordingly, 100% of the time in this category should be allocated to the settled American cases.

■ Second, the guardians suggest that 90% of the time in the global settlement category should be allocated to the global settlement, with the remaining 10% allocated to the individually settled cases. The Court sees no rationale for such an allocation, since all the individual settlements predated the global settlement. Similarly, the 80%/20% allocation for the global settlement aftermath does not appear reasonable. All of the time for the global settlement and the global settlement aftermath should be allocated to the global settlement plaintiffs.

The remainder of the allocations proposed by the guardian *ad litem* appear reasonable, once reduced overall by 5%. The Court is therefore prepared to authorize payments of an additional $45,480.55 from the global and individual settlement recoveries as laid out in Tables 2 and 3.

The guardian has from time to time supplied the Court with updated fee and expense claims for the period after January 1, 1983. Payment of fees for this period on such a piecemeal basis would not be sensible. Once the central trust is in place, the guardians *ad litem* should be relieved of all further substantive responsibility for the settled cases. At that time, the Court will entertain a consolidated request for the guardians' fees and expenses for services these plaintiffs in 1983.[13]

### IV. Amicus Fees

■ In their most recent fee submission, the guardians *ad litem* have renewed their request for their fees and expenses as *amicus curiae*. These fees and expenses were incurred in 1979, when Mr. Work was appointed by the Court to review the question of lawyer communications with the parents and to advise the Court about whether a guardian *ad litem* should be appointed in this case. The Court originally taxed this expense as a cost against defendants, but that mode of payment was disallowed by the Court of Appeals in *Schneider*.

The amount of the *amicus* fees is not now in issue. The only issue before the Court involves the most appropriate allocation of these fees among the plaintiffs. The guardians suggest that 80% of these fees should be borne by the settling plaintiffs, and the other 20% by the nonsettled cases. The Court finds, however, that all of the plaintiffs, foreign and American, have benefitted equally from this activity. Accordingly, the *amicus* fees will be allocated on a *per capita* basis, as shown in Table 4.

---

**13.** Payment for the guardians' services in 1983 will be made from the remainder of the setaside created pursuant to the Memorandum of March 11, 1983. Any services performed by these individuals for the central trust after its creation will be paid for, as appropriate, by the trust itself.

## V. Litigation Expenses

In their motion filed July 26, 1982, plaintiffs' counsel requested 13⅓% of the global settlement, or $1,800,000, for reimbursement of litigation expenses. This amount would be in addition to $513,925.32 already received for reimbursement of litigation expenses from the individually settled cases and partial judgments and $575,000 received pursuant to the stipulations with defendants in 1979.[14]

■ A blanket "percentage" payment for litigation expenses is not appropriate in this case. The more appropriate solution is for the plaintiffs to pay for the expenses actually incurred, regardless of whether that amount is a neat percentage of the recovery. As with the guardians' fees, moreover, the litigation expenses must be allocated between settled and nonsettled cases in compliance with the conditions of the Stipulation of Compromise Settlement. In examining the original submissions supporting the claim for litigation expenses, however, the Court was unable to determine the exact amount of those expenses, although it was obvious that they were larger than the Court had anticipated. The litigation expenses incurred in this case appear to fall into three categories: (1) items that have

been paid for out of amounts received pursuant to earlier settlements and agreements, (2) items that have been paid for out of funds advanced by plaintiffs' counsel (apparently a substantial amount), and (3) items that have not yet been paid for at all. The exact amounts in each category and their precise total were unclear to the Court, to defendants, and, the Court suspected, to plaintiffs' counsel and the guardians as well. Different submissions by counsel and the guardians were inconsistent in their estimates.

■ A more careful examination of the litigation expenses in this case was therefore necessary.[15] The Court appointed Messrs. Harry Huge of Rogovin, Huge & Lenzner and G. Duane Vieth of Arnold & Porter as Special Masters to examine these expenses and to recommend to the Court which amounts should be paid, and from what sources. They and their firms generously agreed to accept this difficult and tedious assignment on a *pro bono* basis.[16] On April 29, 1983, after months of careful examination of the accounts of counsel and the guardians *ad litem* and numerous hearings and depositions, the Special Masters submitted their Final Report.[17]

On May 27, 1983, the Court held a hearing at which all parties were invited to

---

14. *See* p. 796 n. 5, *supra*.

15. Since a substantial amount of these expenses were paid from the Guardian's Fund created with the $5,000 per plaintiff recovered pursuant to the stipulations with defendant in 1979, the Court felt a special need for independent examination of the use made of those funds. *Cf.* D.C.Code § 21–120 (D.C. statute providing for guardian of property for proceeds of settlement recovered by minor plaintiff); D.D.C. Local Rule 1–25 (requiring examination by Auditor Master of the accounts of fiduciaries). *See generally* Second Interim Report of the Special Masters (filed January 12, 1983). The Court has concluded that neither the D.C. statute nor the local rule apply to this unique situation. However, the policies underlying the statute and the rule, with their concern for extra scrutiny by the Court where the property of minors is involved, do apply with equal force to this situation and created an additional need for the appointment of the Special Masters. *See also* Fed.R.Civ.P. 17(c).

16. The Special Masters spent over 680 hours on this task and over $2,000 in expenses. They have performed their task in the finest traditions of our profession and performed a great service to the parties, the Court, the justice system. Their expenses will be reimbursed from interest accrued on the portion of the settlement proceeds to be distributed to the guardians and attorneys. *See* pp. 816–817, *infra*.

17. The Final Report was filed by the Court on May 3, 1983. Because the exhibits to the report included material, such as transcripts of hearings and depositions held by the Special Masters with counsel for both plaintiffs and defendants, that might compromise the work product privilege of counsel on both sides, the Special Masters recommended that the exhibits not be made publicly available. The Court, following this suggestion, ordered the exhibits to be filed under seal subject to a protective order.

show cause why the Court should not adopt the findings and recommendations of the Special Masters. At that hearing, the guardian *ad litem* noted that the Special Masters' Report was "a conscientious and detailed, exceptionally thoughtful piece of work, and we are very grateful to them for their help and their support." Tr. at 3 (May 27, 1983). Plaintiffs' counsel also expressed their appreciation of the care and dedication with which the Special Masters had approached their task. Neither counsel nor the guardian had any comments on the principal body of the Report or the majority of its recommendations. Their only comments focussed on the Special Masters' recommendations regarding the fee of Dr. Cohen, which will be discussed independently in Part IV, *infra*. Otherwise, they appeared to agree that the recommendations of the Special Masters for payment of litigation expenses were reasonable.

The analysis of the litigation expenses found in the Special Masters' Report is extremely thorough, and the Court sees no reason to repeat it here. The Special Masters were able to pin down:

1. The exact amount of the litigation expenses incurred as of August 31, 1982;

2. The proportion of those expenses allocable to the American plaintiffs;

3. The proportion of the expenses that should be disallowed as unreasonable; and finally

4. The exact sum that should properly be paid by the American plaintiffs.

The Court adopts these findings of the Special Masters and will use them as the basis for its calculation of the contribution each American plaintiff should make toward the expenses of this litigation. *See* Tables 6 and 7.

■ The Special Masters found that $2,428,205.24 was the proper amount of the litigation expenses allocable to the American cases.[18] For reasons to be discussed below, that proportion of this amount that constitutes their recommended fee for Dr. Cohen, $410,025.00, will be treated separately. That leaves a final amount of $2,018,-080.24 in other litigation expenses to be shared by all of the American plaintiffs. The Court agrees with the Special Masters that this expense, like that of the guardians *ad litem,* should be shared by all of the settling plaintiffs on a *pro rata* basis.[19]

There remains one difficulty, however. The Special Masters' Report allocates expenses between "American" and "foreign" plaintiffs. The former group apparently includes Carly Kurth, whose case has not been settled. A *pro rata* allocation of the litigation expenses would leave her share as zero, since to date her recovery has been zero.[20] However, the Court is of the opinion, which would doubtless be shared by defendants, that this solution would violate at least the spirit of the Stipulation of Compromise Settlement. For the sole purpose of calculating shares of the litigation expenses, therefore, the Court will impute to Kurth the most common recovery so far received in this litigation: $300,000.[21] If Kurth were to receive a recovery of that amount, her share of these expenses would

---

18. The Special Masters recommended that the Court disallow certain unreasonable items of expenses, such as double charges for certain time spent by medical consultants and inflated charges for photocopying done by one of the law firms involved in the case. *See also* Letter from David and Nancy Shakow (filed May 25, 1983). The Special Masters also recommended a reduction in the fee to be paid to Dr. Cohen. *See* p. 804, *infra*. Overall, however, the Special Masters found "that the itemized expenses . . . were both actually incurred and were reasonable and necessary for prosecution of these cases." Final Report of the Special Masters at 15.

19. Final Report of the Special Masters at 11–14. *See also* Memorandum of March 11, 1983, at 18 n. 18, 19 n. 19, 21 n. 25.

20. The $5,000 received by Kurth pursuant to the Stipulation reached with defendants in 1979, *see* note 5, *supra,* is treated separately.

21. This imputation carries with it no opinion about what recovery, if any, Kurth should properly receive at trial. The imputation of a $300,000 is solely for the purpose of allocating the litigation expenses in the most equitable manner now available.

be $29,708.10. The Court will therefore hold that amount from the global settlement in the Registry until the *Kurth* case is completed. At that time, if Kurth recovers $300,000 or more, $29,708.10 will be paid from her recovery for these expenses and the amount in the Registry will be distributed to the global settlement plaintiffs. If Kurth recovers less than $300,000, she will pay a proportionate amount of her recovery toward this expense, and the balance will be made up from this special set-aside. If Kurth receives no recovery, the entire set-aside will be paid out in reimbursement of these expenses.

## VI. Dr. Cohen's Fee

As the Final Report of the Special Masters makes clear, Dr. Cohen's contribution to plaintiffs' success in this litigation has been substantial. He was substantially responsible for the design, preparation, and presentation of the unique medical and legal theory advanced by these plaintiffs.[22] According to the Special Masters,

> Dr. Cohen's role far transcended that of the ordinary hired expert consultant. He arranged for and coordinated the services and testimony of the consultants and expert witnesses. His activities were not limited to the medical area. He also coordinated the services performed by experts in the fields of aviation, economics, education, engineering, geography, photogrammetry, and psychology.

Final Report at 16–17. According to the Special Masters, Dr. Cohen assumed substantial responsibility for consultations with other experts in developing the theory of the case, for locating and hiring expert witnesses and consultants and negotiating their fees, for preparing witnesses, for assisting plaintiffs' counsel in the develop-

ment of trial strategy, and for the development of cross-examination questions for defendants' experts. *Id.* at 21 n. 14.

Dr. Cohen negotiated three separate contracts with plaintiffs' counsel and the guardian *ad litem* to provide for his compensation in this litigation. The first contract set Dr. Cohen's compensation at $40,-000 for six months' employment, plus a contingency fee of 1% of the eventual recovery. The second contract, negotiated a year later to replace the first contract, provided for compensation of $6,500 per month plus 2% of the total recovery. The third and final contract was negotiated in July 1981, after the Court of Appeals decision in *Schneider* and before the discovery of the 1000 missing documents. This third contract replaced the contingent fee arrangement with a strict hourly rate of $100 for all of Dr. Cohen's work after September 1979. Each one of these contracts stated clearly that the compensation arrangement was "subject to approval by the trial judge at the time the children's awards and fees and expenses are submitted to the Court for its approval."[23]

Plaintiffs' counsel have argued to the Court that it is bound to a substantial degree by the terms of this contract, which was entered into by the Court-appointed guardian *ad litem* on behalf of his wards. The Special Masters, on the other hand, have suggested that the Court reject the contracts for Dr. Cohen's compensation. They recommend that the Court instead authorize payment to Dr. Cohen of a reasonable annual fee for his services in this litigation. They suggest that $175,000 per year is the maximum reasonable fee under the circumstances.

Plaintiffs' counsel and the guardian *ad litem* vigorously oppose this proposal of the

---

**22.** It is no doubt fortunate that there have been no other recorded cases in which over 100 war orphans have alleged brain injury from the trauma of explosive decompression and a resultant airplane crash, but that fact has made this litigation particularly difficult.

**23.** Despite this provision of the contract, neither counsel nor the guardian submitted this contract to the Court for its approval at the time of their motions for reimbursement of expenses in July 1982. The Court was only made aware of these contracts through the investigation and Report of the Special Masters.

Special Masters. They argue that there is no evidence to support the recommendation that the Court disapprove compensation to Dr. Cohen of more than $175,000 per year. They contend that the Court should accept contemporaneous determinations of the guardian and counsel about the proper value of Dr. Cohen's services. Counsel point out that payment to Dr. Cohen was long delayed and that his service to this case diverted him from other more lucrative opportunities, one of which might have earned for him as much as $300,000 per year. Counsel and the guardian express concern about their ability to persuade Dr. Cohen to complete his work on the pending cases if their fee agreement with him is not approved. Counsel also express some concern that if the Court were to approve the recommendation of the Special Masters and reduce the compensation that counsel and the guardian have agreed to pay Dr. Cohen, future plaintiffs and their counsel would encounter great difficulties in obtaining expert assistance.

These contentions present a delicate question. Obviously, the contemporaneous decisions of the guardian *ad litem* and counsel about Dr. Cohen are entitled to great deference. On the other hand, the Special Masters were selected because they were experienced litigators and litigation managers, familiar with the services of forensic experts and the cost of such services. The Court looks not merely to their technical findings and conclusions, but also to their specialized judgment based on rich and relevant experience. Their view of what is reasonable, based on extensive testimony and formed away from the "din of battle," is also entitled to great deference.

In forming their recommendation, the Special Masters had before them Dr. Cohen's extensive deposition about his relatively limited experience abroad and in the United States before he became involved in this case, his functions in the case, the methods through which he performed those functions, the other opportunities available to him, and what he has done since the demands of this case have declined. They noted particularly that he did not have any overhead expense because the Lewis firm furnished him an office and secretarial and other support. Their finding that he was not bearing the risk of an independent business but functioned "essentially" as a salaried employee of the Lewis firm is supported by the fact that the firm carried his overhead so that his gross compensation was also his net.

The Court is persuaded by the Special Masters' Report that the compensation which would be due to Dr. Cohen under the third contract is too high for approval after the fact. This conclusion is based on, among other things, the comparison of the contract fees with the fees negotiated by Dr. Cohen with other experts and consideration of the moment in the history of this litigation when this third contract was entered.

The third contract was entered into in July 1981, when the chances of the infant plaintiffs to achieve a substantial recovery in this litigation appeared to be much diminished. The Court of Appeals decision in *Schneider,* which invalidated all the jury verdicts received up to that time, was handed down only a few months earlier, and the belated discovery of the photographs of the crash site and other documents, which infused new life into the plaintiffs' case, was still in the future. Considering this general situation, plaintiffs' counsel and the guardians can hardly be criticized for their efforts to keep their medical expert by changing his partially contingent fee agreement to a straight-time contract. However, in light of the entire record in this case, including subsequent events, the Court finds that the fee resulting from this third contract is unreasonably high.

The Special Masters judgment of $175,000 per year as reasonable compensation is persuasive in the abstract. But counsel have a point that it is not supported either

by a contract negotiated between counsel and Dr. Cohen or by record evidence. Although the suggestion of the Special Masters on this point appears reasonable, the Court prefers to defer, to the greatest extent possible, to the contemporaneous judgment of the guardian. Although the Court agrees with the Special Masters that the fee resulting from the formula of the third contract is unreasonably high, the Court is satisfied that the amount negotiated and agreed upon between the guardian and Dr. Cohen in the *second* contract is reasonable.[24] The compensation formula of the second contract results in a higher fee than that proposed by the Special Masters, but given Dr. Cohen's great value to the plaintiffs, it is well within the range of reason.

The Court therefore approves the "Second Amendment to September 19, 1979 Consulting Agreement," executed July 24, 1980.[25] Final calculation of Dr. Cohen's fee for these cases may be found in Table 5.[26]

 The Special Masters have suggested to the Court that, given the breadth of Dr. Cohen's role in this litigation, there is substantial question about whether his fee should properly be characterized as a "litigation expense." The Special Masters have suggested that the Court take Dr. Cohen's role and his fee into consideration in its calculation of the attorneys fees in this

litigation. The Court agrees that such an approach is appropriate. The proper relationship between Dr. Cohen's fee and that of plaintiffs' counsel will be discussed further below.

### VII. Attorney Fees

#### A.

Plaintiffs' counsel have requested Court approval of their contingent fee contract with their clients, under which they promised to request "no more than" one-third of the recovery in the case. Plaintiffs' counsel formally requested a fee of one third of the global settlement recovery in a motion filed July 26, 1982.[27] On October 12 and 13, 1982, after notice to the parents or guardians of each of the 45 infant plaintiffs entitled to participate in the proceeds of the settlement, the Court held an evidentiary hearing on this and related motions. The guardian *ad litem* addressed the Court from his perspective as a court-appointed client about his appraisal of the level of effort, the quality of that effort, the difficulties encountered by counsel, and the results achieved. Colonel Susan Gaylor, the adoptive mother of two of the United States infants aboard the C-5A, addressed the Court on behalf of herself and the other parents in support of the fee application.

---

**24.** It is quite likely that the total fee calculated under the second contract is substantially higher than Dr. Cohen, counsel, and the guardian would have anticipated at the time they abandoned this contract in favor of the third contract. *See* p. 805, *supra.*

**25.** This decision does not, however, preclude counsel and the guardian from contracting with Dr. Cohen for future services on an hourly basis, if such an arrangement appears to be the wisest course under current circumstances.

**26.** A small portion of this fee will be held in the Registry as a set-aside pending resolution of the *Kurth* case. *See* p. 803, *supra.*

**27.** Counsel have also requested a fee of one-third of the individual settlements and partial judgments received before the global settle-

ment. The Court has to date awarded them an average of 30.5% of those recoveries. *See* Table 1. However, all of those payments were made on an interim basis and with the understanding that the final award of fees for these cases would be determined at a later date. Counsel were informed that this final award would be based upon a number of factors, including those laid out in the D.C. Circuit decision in *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980) (*en banc*). Since this case involves a contingent fee agreement rather than a fee award statute, it would be inappropriate to require all of the detailed proofs of hours and fees envisioned by *National Association of Concerned Veterans, supra.* However, *Copeland* is still of value for its reminder of the factors to be considered in setting a "fair" fee commensurate with the market value of the attorneys' services.

No other parent receiving the notice of hearing appeared at that time.[28]

At the hearing, the guardian *ad litem* and plaintiffs' counsel testified under oath about the extent of the attorneys' work on behalf of the plaintiffs, the attorneys' customary fee practice, the out-of-pocket disbursements that they had incurred or for which they were obligated, and the understanding between counsel, the guardian *ad litem,* and the adoptive parents of the individual plaintiffs about fees. They also produced testimony from two trial lawyers who are experienced in the customary fee arrangements in the District of Columbia for representation of clients in personal injury cases.

Counsel for the United States cross-examined these witnesses. Counsel for Lockheed chose not to do so. Both expressed concern about the potential inadequacy of the settlement should it be reduced by the fees claimed. In order to complete the record, the Court obtained from them evidence of the approximate amount of time and the costs incurred by defendant, the three law firms that represented defendant, and the legal and other personnel of the several agencies of the United States involved in the defense.[29]

Counsel for the guardians of one infant plaintiff, Michael Moses Schneider, informed the Court that they had wished to be represented at the hearing but had not received the notice in time. Accordingly, the Court held an additional hearing on November 23, 1982, at which Ms. Doris Besikof, counsel for the Schneider family, appeared. She presented to the Court her client's views on a number of issues surrounding the settlement, including attorney fees. In her oral presentation and in a written memorandum filed with the Court, Ms. Besikof suggested that an appropriate fee in this case would be 20–25 percent of the total recovery.

The comments submitted to the Court by the various parties who participated in these hearings appear to fall into three general categories and represent the basic factors that the Court must consider in determining an appropriate fee for plaintiffs' counsel in these cases. The comments concern: (1) the relative value of the attorneys' services, considering what other attorneys charge in comparable cases, (2) the absolute value of their services, considering the quality of their performance and the results achieved, and (3) the need to avoid a huge fee award that would eat up a disproportionate share of the settlement recovery of these infant plaintiffs.

### B.

Plaintiffs' counsel rest their fee claim for one third of the settlement recovery primarily on their contract with their clients. They cite the testimony of two experienced lawyers, one the incumbent President of the District of Columbia Bar, Jacob Stein, Esq., that a one-third contingent fee for plaintiffs' counsel is customary in this district in personal injury cases. Conceding that the contract is for a fee "not to exceed" one-third of any recovery, counsel for plaintiffs assert that, in the circumstances of this protracted litigation, the ceiling should be the fee.

According to their counsel, both defendant and the United States "vigorously oppose" an award of the "magnitude" claimed here as "excessive and unjustified in this type of litigation." United States Post Hearing Submission Re: Attorney's Fees at 1 (October 19, 1982). Government counsel

---

28. On the second day of the hearing, the Court's chambers received by telephone a telegram from the local attorney of plaintiff Dewey and her parents saying in a conclusory way that the fee sought by plaintiffs' counsel was "unconscionable."

29. Defendant and the United States produced this information as they were able to gather it. However, no figures were given for time spent by the employees of defendant's insurer, time spent by government employees other than attorneys and in agencies other than the Department of Justice and the Air Force, or the expenses incurred by the government.

suggested that the one-third fee custom testified to by plaintiffs' witnesses related to personal injury cases generally and is not applicable to air crash cases. He offered no testimony or other evidence on this issue, however, and he proffered only hearsay observations and opinions of other attorneys that 20 percent or less is the customary contingent fee in air crash litigation and that one air crash specialist charged at an average rate of 17 percent. Counsel for the United States pressed with particular vigor a contention that the contract for a fee of one-third of the recovery was tainted by what he claimed was the failure of plaintiffs' counsel and the guardian *ad litem* to advise the parents that 20 percent or less was the customary contingent fee in air crash litigation.

In response, one of plaintiffs' counsel, Oren R. Lewis, Jr., directly contradicted the claim of government counsel that no one had advised the guardian *ad litem* that some attorneys charge contingent fees of less than one-third in air crash litigation. His affidavit reiterates the statement in a letter written to the individual parents by the guardian *ad litem,* after review by all counsel (including government counsel), that "the contingent fee charged by attorneys handling such claims typically vary from 20 percent to 40 percent of the recovery." *See* pp. 795–796, *supra.*[30]

In further support of his claim, Mr. Lewis's affidavit identified other complex air crash multidistrict litigation cases in which his firm participated between 1970 and 1980. According to the Lewis affidavit, most of the contingent fee agreements in those cases have been for one-third of the recovery. Moreover, according to the Lewis affidavit, although economies of scale may justify a fee lower than one-third in multiple air crash death cases, those economies were unavailable in these personal injury claims of infant survivors, because liability was contested for four years and thereafter "each infant's entire medical history was exhaustively examined and reexamined, and the causation and extent of each plaintiff's injury was contested longer and more vigorously than in any case known" to Mr. Lewis.

To counter the unsworn hearsay representations of government counsel, the Lewis affidavit reports the opinion of Milton G. Sincoff, an experienced air crash litigator and partner of the air crash attorney quoted by the government, that in general a one-third contingent fee was "eminently reasonable" in an air crash case involving personal injuries rather than wrongful death, because issues of causation and extent of injury may preclude the economies of scale normally available in a fatal crash case. Mr. Sincoff advised Mr. Lewis that the cases cited by defendants' counsel as precedent for a fee of less than one-third involved no issues of causation or extent of injury and that the liability questions were quite different. Mr. Lewis suggested that those cases are therefore not a reliable guide to the fee appropriate here.

## C.

Plaintiffs' counsel also argue that their fee request is appropriate under the guide-

---

**30.** In light of this clear factual evidence in contradiction of the government's contention, this attack on the guardian *ad litem* and plaintiffs' counsel by government counsel is inexplicable and disappointing. He and his staff, as well as Lockheed's counsel, participated fully in the several weeks required to draft the guardian's communication to the parents. This serious error and other conduct of government counsel at the fee hearing impairs the usefulness to the Court of the other government contentions on the subject of fees. For example, government counsel's failure to counter with sworn testimony or affidavit the sworn evidence adduced by and on behalf of plaintiffs' counsel at the hearing of October 13 and 14, 1982, strongly reduces the probative value of the other unsworn representations by government counsel. *Cf. National Association of Concerned Veterans,* 675 F.2d at 1337–38 (Tamm, J., concurring) (opposition to fee request must be supported by "facts and detailed affidavits"); *Donnell v. United States,* 682 F.2d 240, 250 (D.C. Cir.1982) (requiring objections to fee requests to be specific), *cert. denied,* —— U.S. ——, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983).

lines laid down in *Copeland v. Marshall, supra.* They point out that their "lodestar" fee calculated under *Copeland* principles, even without adjustments for risk, quality of performance, or results achieved, far exceeds the fee that they are requesting under their contract with plaintiffs. Therefore, they contend, their entitlement to the contract fee follows *a fortiori.*

The effort expended by the plaintiffs' attorneys in this litigation has been immense. The American plaintiffs in this litigation have so far achieved a total recovery of $17,453,608.90. In order to achieve these partial judgments, individual settlements, and, finally, the Stipulation of Compromise Settlement, plaintiffs' counsel conducted 12 plenary jury trials, each of which consumed from 7 to 20 trial days, with a total of 250 witnesses, 142 for plaintiffs and 108 for defendants. The trials were recorded in over 23,000 pages of trial transcript. There have been 163 court hearings before 9 district judges recorded on 8,600 transcript pages. In addition, plaintiffs' counsel participated in nearly *500* depositions during various stages of discovery. Depositions were taken all over the United States and even, in at least one case, in Thailand.

Each trial had a full life of its own: pretrial briefs and conferences, new trial motions, and, in three cases, plenary appeals. Before the trials began, there were, among many other controversies, a long legal dispute over the executive privilege claim of the United States and Lockheed, a motion to dismiss, a motion to disqualify the Lewis firm and, on literally the eve of the first bellwether trial, a motion to disqualify this judge because his wife's sister had adopted two Oriental children then aged 16 and 11. In addition, there was a

fully briefed mandamus proceeding in the Court of Appeals. Development of a correct communication to the individual parents also required substantial lawyer time.

After the first series of trials, there was an evidentiary hearing on a motion for preliminary injunction to provide interim relief for plaintiffs pending the several years of trial that portended when an overall settlement seemed beyond reach. Counsel spent many hours developing a form of trust that could be used to provide this interim relief. Thereafter, protracted negotiations on an interim settlement consumed many hours of lawyers' time before, after approval by trial counsel, it failed approval at the policy level in the Department of Justice. Finally, the plaintiffs' pursuit of the 1,000 missing photographs and other documents and sanctions for the delay in their production involved the equivalent of a plenary trial, complete with necessary but extensive discovery and a full evidentiary hearing.

Overall, before the recent settlement for $13,500,000 was reached in the 45 cases presently of concern, the three firms representing plaintiffs spent about 47,763.65 hours of lawyer time, and 32,049.70 hours of support time on this litigation.[31] At the rates that these lawyers charge for their time in non-contingent engagements (up to $250 per hour) their fees would have been $7,270,470.25. The disbursements for witnesses, transcripts, transportation, exhibits, and the like, for which counsel seek or have already received reimbursement total more than $2,400,000 for the American cases alone.[32] In order to keep the litigation going during the long period when there was very little recovery, counsel had to advance a substantial proportion of this amount from their own personal funds.[33]

**31.** A significant amount of this time was spent on cases not included in the global settlement. However, that fact is counterbalanced by the considerable expenditure of time dedicated to these cases by counsel since the global settlement. These figures therefore provide a roughly accurate estimate of the amount of time

spent by plaintiffs' counsel on the American cases.

**32.** *See* p. 803, *supra.*

**33.** The precise amount advanced by plaintiffs' counsel toward litigation expenses is not clear. When added to the amount of unpaid expenses

The occasion for this enormous time expenditure is explained substantially by the 56,816 hours of lawyer time consumed by Lockheed's three outside law firms. Lockheed was not asked to disclose its actual fees. However, if its lawyers' time charge averaged $100 per hour,[34] this portion of the total attorney fee paid by defendants would be $5,681,600. In addition, the Department of Justice estimated that its lawyers spent about 8,338 hours on the cases. The Air Force Judge Advocate General's office spent about 2,800 hours. Moreover, Lockheed estimated that its own employees spent nearly 5,800 lawyer hours. Thus defendants spent more than 73,700 hours of time in the defense of the cases.[35] Lockheed estimates its total expenses, i.e. the disbursements by counsel, including the United States share of any shared expenses, at $1,463,259. The expenses incurred by the United States alone are unknown, but they are doubtless considerable.

Defendants suggest that this high expenditure of time by their counsel is the result of their need to react to the actions of plaintiffs' counsel. In many cases, this type of cause-and-effect analysis may be correct, but here it is clearly erroneous. In fact, a substantial proportion of the time of plaintiffs' counsel was expended on proceedings and tactics for which *defendants* were responsible, such as the mandamus petition, the motion to disqualify, and the sanctions proceeding for alleged discovery abuse by defendants. The high expenditure

of time by defendants is therefore strong evidence of the reasonableness of the amount of time spent by plaintiffs' counsel on this case.

Defendants challenge the hourly rates used by plaintiffs' counsel in calculating their lodestar fee. They cite the rates fixed by Judge Gesell for liaison counsel in the *Swine Flu* cases [36] and the fees claimed in this litigation by Messrs. Cole and Groner for their services as liaison counsel in the related Saigon air crash cases that have been settled. Judge Gesell allowed fees of $75 per hour for partners' time and $40 per hour for associates' time. Messrs. Cole and Groner claimed, under a pretrial order, 5 percent of the recoveries in the cases they settled, which amounts to approximately $44 per hour for their services as liaison counsel.

The impact of defendants' attack on the hourly rates of plaintiffs' counsel is marred somewhat by their failure to produce any evidence that their own hourly rates were anywhere near as low as those they seek to impose on their opponents.[37] In fact, it is very likely that several of defendant's lawyers, such as Mr. Dubuc, charge hourly rates well in excess of those paid to the *Swine Flu* attorneys.

However, some adjustment in the lodestar rates of plaintiffs' counsel is in order. One of plaintiffs' counsel, J. Vernon Patrick, who served as appellate counsel and as a "lawyer's lawyer," demonstrated by his

for which counsel have become obligated, however, the amount probably at one time exceeded $1 million.

**34.** This is a conservative estimate. Plaintiffs' lawyers claimed an average hourly rate of $125.38 in this case. It seems unlikely that defendant's counsel's hourly rates were significantly lower.

**35.** Lockheed has furnished no estimate of the time spent by its insurance carriers. The United States has furnished no estimate of the time spent by the Central Intelligence Agency, the Federal Bureau of Investigation, or any other government agencies involved in the case.

**36.** *In re Swine Flu Immunization Products Liability Litigation,* 89 F.R.D. 695 (D.D.C.), *aff'd* 672 F.2d 897 (D:C.Cir.1981).

**37.** Defendant Lockheed objected vehemently to plaintiffs' counsel's request to discover the fees they charged their own client. (The compensation of attorneys for the United States, who are all salaried employees of the government, is not directly relevant here.) Although Lockheed's claim of attorney-client privilege on this point was somewhat questionable, the Court refrained from requiring discovery of their actual fees in its Order requiring discovery of the hours spent by Lockheed employees and counsel in this litigation.

sworn and uncontradicted testimony that his services are in great demand from clients willing and able to pay his hourly rate of $225, win, lose or draw. However, Mr. Lewis did not make the same showing that his $250 per hour rate is readily marketable in non-contingent cases. And neither of them supported with facts the hourly rates attributed to their younger partners and associates. Strictly applying *Copeland,* the Court would probably recalculate the rates of Mr. Lewis to $150 per hour (the rate charged by Mr. Stein, President of the D.C. Bar) and reduce the rate of the other attorneys involved to an amount closer to the $75 rate for partners and the $40 rate for associates used by Judge Gesell in the *Swine Flu* litigation. This would produce a lodestar of approximately $5,550,-000.00. However, that figure, based on hourly rates alone, is no fair measure of this high risk professional engagement, which resulted in two defendant verdicts in 12 trials, many continuances, and other frustrating efforts, and has required counsel to commit hundreds of thousands of dollars of their own money at an interest cost of as high as 21 percent. Under *Copeland,* a lodestar adjustment of 50 percent is fully justified by the contingency factor alone.[38] A reasonable contingency adjustment of 50 percent would increase the fee to approximately $8,325,000.00, well in excess of the one-third claimed on the contract.

The Court has also considered the possibility of adjustment for the quality of counsel's work and results achieved. Overall, the evaluations of counsel's performance by their clients, the guardians *ad litem* and the plaintiffs' parents, appears to be quite positive. At the hearing on attorneys fees, the guardian *ad litem,* Mr. Work, related his original investigation of plaintiffs' attorneys, his original conclusion that they were "highly qualified" and successful attorneys, and his retrospective view that this was "a

highly successful effort on behalf of these children," "a splendid result." Tr. of October 12, 1982, at 6–7. He singled out the medical work as "truly innovative," *id.* at 10, and noted that "long and hard hours were put in by these attorneys without concern for their own personal lives, ... their own daily cares, and, indeed, for the rest of their practice." *Id.* at 16.

Colonel Gaylor gave a similar evaluation of counsel at the hearing. She stated that she "could not say enough" about the entire Lewis firm. She thought that "they have been absolutely fantastic through the whole proceeding" and thought "we are pretty lucky to have them as the firm representing us." According to Colonel Gaylor, "They are always there when you need them.... You can trust what they say.... I think they were underpaid." Tr., Oct. 12, 1982, at 8, 14.

The Court has also had substantial opportunity to evaluate the performance of plaintiffs' counsel. This Court supervised five trials, three of which resulted in verdicts for the plaintiff, one in a defendant's verdict, and one in which, after one issue was settled out for $30,000, the jury returned a verdict for defendant on the remaining issue. The Court found that the quality of the work of plaintiffs' counsel was uneven. On legal issues, some of them did quite well, and on many occasions, brilliantly. Their development of medical evidence was both innovative and persuasive to jurors.[39] Their development and prosecution of the sanctions motion was highly professional. They exhibited considerable ingenuity in overall strategy, which, if it had been successful, could have materially reduced the time and cost required. Yet plaintiffs' counsel were sometimes disorganized and ill-prepared. Mr. Lewis' arguments to the jury were too often more inflammatory than analytical, a fact that contributed to

---

**38.** For a collection of decisions increasing a lodestar to compensate for contingency and delay in related contexts see E. Larson, *Federal Awards of Attorneys' Fees* 219–227 (1981).

**39.** *But see,* p. 804, *infra.*

the Court of Appeals' reversal of the bellwether verdicts.[40] However, these deficiencies are easily offset by the value to the plaintiffs of counsels' organizing of innovative medical evidence, their effective cross-examination of some of plaintiffs' experts, and the difficulties that defendants' massive resources (and considerable skill) presented to counsel attempting to prepare and prosecute a myriad of cases. The favorable judgment of Colonel Gaylor and the guardian *ad litem* are entitled to great weight.[41] All things considered, the Court is persuaded that if these fees were to be fixed strictly according to *Copeland* standards, no adjustment for quality would be in order in either direction.

The result achieved must also be considered. *Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Plaintiffs' counsel point out that plaintiffs required sophisticated representation to hold on to their claims in the face of defendants' preliminary legal maneuvers, such as the effort to mandamus dismissal, and that less dedicated counsel would not have had the physical and financial stamina to withstand the attrition defense in the trial courts. They assert that the global settlement became feasible only after defendants, confronted by their failure to produce 1,000 photographs and other documents and a serious motion for sanctions, increased their basic offer from $75,000 to $300,000. Overall, these counsel have achieved recoveries for their clients that total more than $17 million for 51 plaintiffs.

However, there is an anomoly that, while, as the guardian *ad litem* stated, the result is "splendid" in terms of the litigation value of the plaintiffs' claim, the expenses consumed in achieving it are so large that there remains uncertainty about the adequacy of the recovery to pay those expenses and fees and to provide adequately for the minor plaintiffs.[42] The Court recognizes that expenses were attributable in considerable measure to difficulties encountered by plaintiffs in meeting the attrition defense, and also to the aborting of several trials after preparation because of the inability of individual judges to meet trial dates. However, the Court is persuaded that some lodestar adjustment is appropriate to take into account the substantial difference between the expenses reasonably anticipated and those in fact incurred. While these expenses were not fully within the control of either the plaintiffs or their attorneys, the plaintiffs were entitled to rely on counsel to anticipate and contain them. Thus, if this case were governed by *Copeland,* a 25% downward adjustment of the lodestar would be in order to reflect the impact of the expenses on the value to the infant plaintiffs themselves of the results achieved. The final adjusted fee under *Copeland* principles would thus be approximately $6,900,000.00.

### D.

■ Although *Copeland v. Marshall* and its progeny provide a useful general guide for the Court's decision in this case, they are not alone determinative. Unlike *Copeland,* this case involves attorney fees to be paid, not by defendant under a federal fee statute, but by plaintiffs themselves out of their settlement recovery. The Court has a responsibility in such a case to oversee the fairness of the fee in a more general sense. *See Krause v. Rhodes,* 640 F.2d 214 (6th Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Cappel v. Adams,* 434 F.2d 1278 (5th Cir.1970). This is especially true when the plaintiffs are minors and are hence in no position to judge for themselves the value of the services rendered by their attorneys or to protect fully their own interests and needs in the

---

**40.** *See Schneider,* 658 F.2d at 845–46.

**41.** Counsel for the Schneider child disagreed with the amount of the fee request, but she offered no specific criticisms about the quality of the services performed by plaintiffs' counsel.

**42.** *See* p. 813, *infra.*

division of a settlement award negotiated on their behalf. These considerations, among others, provided the basis for the Court's appointment of the guardian *ad litem* in this case. These concerns also require the Court to give special scrutiny to the claim for attorney fees. In this situation, the Court must consider not only the fair value of the services rendered by plaintiffs' counsel, but also the needs, both present and future, of the infant plaintiffs who are the Court's special responsibility.

There is considerable precedent for the reduction by a Court of contingent fees set by contract with an infant or his guardians to an amount considered more appropriate under the circumstances. *See Hoffert v. General Motors Corp.,* 656 F.2d 161 (5th Cir.1981) (20 percent), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); *Cappel v. Adams,* 434 F.2d 1278 (5th Cir. 1976) (20 percent); *Donnarumma v. Barracuda Tanker Corp.,* 79 F.R.D. 455 (C.D.Cal. 1978) (15 percent); *Bonilla v. Consolidated Mutual Ins. Co.,* 329 F.Supp. 97 (D.P.R.1971) (30 percent); *Abel v. Tisdale,* 619 P.2d 608 (Okl.1980); *Rivera v. City of New York,* 25 A.D.2d 297, 269 N.Y.S.2d 200 (1966) (10 percent), *aff'd* 19 N.Y.2d 776, 279 N.Y.S.2d 530, 226 N.E.2d 317 (1967); *see also Goldman v. Eisinger,* 289 Md. 611, 425 A.2d 1356 (Md.1981); *Knupp v. Schmelzer,* 87 Misc.2d 641, 386 N.Y.S.2d 339 (Sup.Ct.1976); *Western Life Ins. Co. v. Nanney,* 290 F.Supp. 687 (E.D.Tenn.1968); *Werner v. Levine,* 52 Misc.2d 653, 276 N.Y.S.2d 269 (Sup.Ct.1967). In addition, Fed.R.Civ.P. 17(c) gives the Court a special responsibility to safeguard the interests of infant litigants whose cases are before it.

Counsel for the United States, as well as Lockheed's counsel, expressed concern about the adequacy of the funds available to each plaintiff if so much is consumed for fees and expenses.[43] They point to the set-

tlement negotiations in the fall of October, 1981, when the defendants raised their offers from $75,000 to $300,000 per case, only to have the offer rejected because the guardian *ad litem* then claimed that a minimum of $250,000 net per case was required to meet the needs of all of the plaintiffs.

The guardian confirms the defendants' assertion that he advised the Court that he originally rejected as insufficient an offer of $300,000 for each U.S. plaintiff made by defendants in October, 1981. According to the guardian, while the offer might have been adequate to pay the very heavy fees and expenses incurred by the lawyers and himself and to have a balance adequate for some plaintiffs, there were some who were exposed to risks from brain damage that could require extremely expensive, long-term treatment and hospitalization. In 1981, he did not deem the offer adequate to pay expenses of the litigation and also to provide for these extreme risks to which some plaintiffs were exposed. The guardian then thought that a minimum of $250,-000 net was required.

At the time the 1981 offer was rejected, however, the guardian had not inquired about independent means that were available to individual plaintiffs from their parents and from state and local sources to provide for relatively routine training and treatment for each of the children. When defendants renewed their offer in June 1982, the guardian included those independent means in his calculations. He determined that if those independent means could be treated as available to each plaintiff, the group would require substantially less than $250,000 each, provided a substantial portion of the recovery could be accumulated in a trust and later distributed to those who confronted extraordinarily burdensome expenses deriving from the crash.

In addition to the criteria afforded by the record and by other cases fixing fees for

---

43. Defendants were aware at the time of the settlement of plaintiffs' fee agreement with their counsel and no doubt had a good idea of the extent of plaintiffs' litigation expenses, yet they apparently considered their settlement offer to be adequate at the time they made it. This belated concern for plaintiffs' welfare, therefore, seems rather suspect.

attorneys representing minor plaintiffs, the Court has considered as an analogous guideline the limitations that Congress has imposed on attorneys' fees for services rendered in prosecuting certain claims against the government. Although Lockheed and not the government is the nominal defendant here, the government agreed in 1979 to indemnify Lockheed for a portion of its outlay pursuant to the settlement. The vigorous, if eccentric, attack by government counsel on the fee suggests that the government's share must be substantial, so it is not inappropriate to look for some guidance in the limitations imposed by Congress for contingent fees paid by plaintiffs from recoveries from the government.

Several statutes limit attorneys' fees to 10 percent of a recovery from the federal government.[44] The Court finds more meaningful, however, the 25 percent ceiling on fees imposed by the Federal Tort Claims Act ("FTCA") and the Social Security Act.[45] Although this is not formally a claim under FTCA, it closely resembles one in many respects. As indicated, the government will pay a substantial part of the funds to be used to pay the fees. In addition, the civilian plaintiffs were injured while they were passengers on a United States Air Force plane, built for the Air Force under a contract closely supervised by the Air Force. Indeed, when plaintiffs sought the documentary evidence that was finally produced only recently, Lockheed invoked the continuing effect of this contract as a basis for claiming the protection of the government's executive privilege.

■ The policy decision of Congress to limit fees for services to Social Security claimants has some message for a court responsible for fixing fees to be paid from the estates of infants, entitled to special court protection under principles of equity and Fed.R.Civ.P. 17(c). Social Security beneficiaries are generally the elderly, widows, and orphans, a category that includes these plaintiffs and for which Congress has afforded protection from excessive attorneys' fees. *Folsom v. McDonald,* 237 F.2d 380 (4th Cir.1956); *In re Crouse,* 273 F.Supp. 642 (S.D.W.Va.1965) (attorney fee for infant in Social Security case reduced by court to 25 percent of recovery from the 50 percent specified in contract).

There is authority in FTCA and Social Security fee cases to reduce to 25 percent a contingent fee agreement for a larger percentage and not to attempt to "fine-tune" the arrangement further. In *Robak v. United States,* 658 F.2d 471, 479–180 (7th Cir.1981), the Court of Appeals ruled that so long as a contingent fee was less than 25 percent of an FTCA recovery, it was not reviewable by a Court.[46] Here the Court is persuaded that application of the FTCA's 25 percent limit by analogy is appropriate and that the plaintiffs' evidence demonstrates, without effective contradiction by defendants that, as a matter of law and on principles of equity, counsel is fully entitled to that percent, but no more, as a base fee.

The Court finds, however, that one adjustment must be made to the amount to be paid directly to plaintiffs' counsel. In their Final Report, the Special Masters suggested that "a question is presented to the Court whether the fees of Dr. Cohen should be considered as litigation expenses, to be paid by plaintiffs in addition to attorneys' fees,

---

**44.** *See* 22 U.S.C. § 1623(f) (settlement of post-World War II international claims); 22 U.S.C. § 227d–21 (International Boundary & Water Commission claims involving U.S.–Mexico boundary); 31 U.S.C. § 243 (claims against U.S. by military personnel); 50 U.S.C.App. § 20 (Trading with the Enemy Act—fee limited to 10 percent of value of property involved, but court may allow more in special circumstances); 50 U.S.C.App. § 1985(f) (American Japanese Evacuation claims).

**45.** Federal Tort Claims Act, 28 U.S.C. § 2678; Social Security Act, 42 U.S.C. § 406(a).

**46.** *But see Pollard v. United States,* 69 F.R.D. 646 (N.D.Ala.1976) (applying what are now *Copeland* principles to reduce to 12½ percent a contingent fee for counsel representing prisoners and the estates of prisoners whom the government had infected with syphilis as part of an experiment).

or whether the fees of Dr. Cohen should be considered in determining the award of attorneys' fees." Final Report at 22. The Special Masters were moved to raise this question by the fact that the attorneys seek a fee equal to one-third of the settlement proceeds and that Dr. Cohen's activities went far beyond the normal duties of an expert witnesses or consultant and were more "adversarial" in nature. They found him to be in many respects an "assistant" to Mr. Lewis and an "agent" of the Lewis firm.

Plaintiffs counsel understandably resist this suggestion.[47] They argue that disbursements for experts are customary in the profession, that Lockheed and the United States have had access to an infinite host of experts, and that charging Dr. Cohen's fee to counsel would chill the ardor of lawyers to represent plaintiffs of modest means in the future.

The representation agreement between plaintiffs' counsel and the guardian *ad litem* (and, through him, the plaintiffs themselves) entered into in 1979 clearly contemplated a distinction between litigation expenses, for which plaintiffs would be responsible regardless of the amount of their recovery, and attorney fees, which would be paid on a contingent basis, depending upon the recovery obtained.[48] The litigation expenses have been monitored, first by the guardians and counsel, and now by the Special Masters, to guard against duplication of effort that would result in the plaintiffs' paying twice for the same service. On the same theory, it is appropriate to examine the charges made for legal services to ensure that no such service, properly chargeable under the contingent fee agreement, is in fact charged as a litigation expense.

█ It is apparent from the Special Masters' account of Dr. Cohen's work and from the testimony on which they relied that a portion of that work involved case preparation and management, services that are normally performed by attorneys and for which they are compensated by their contingent fee. If there had been no recovery here, the Court would probably reduce any claim by the Lewis firm against the plaintiffs for reimbursement of payment made or due to Dr. Cohen to the extent that that payment was for services normally performed by attorneys. These services, as described by the Special Masters, included negotiation of expert witness fees, supervision of hired experts, preparation of witnesses for depositions and for trials, development of questions for direct and cross-examination, participation in discussion of trial strategy, and assessment of jury reaction to witnesses. From the facts found by the Special Masters, the testimony which they took and from the Court's own impression of the relative capabilities and function of various counsel and of Dr. Cohen, the Court concludes that one-third of Dr. Cohen's effort is more appropriately classified as work which would normally be performed by attorneys.

This conclusion does not imply any criticism of Dr. Cohen, the guardian, or the attorneys for the division of labor that they evolved. That arrangement has in fact proven to be a highly successful one. However, in keeping with the general principal that the infant plaintiffs should be charged no more than once for each cost of this litigation, that proportion of Dr. Cohen's services that was essentially legal in nature will be allocated to the category of attorney fees.

The final fee to be awarded plaintiffs counsel for their efforts in the 51 settled cases is therefore $4,213,637.95 or 24.1362%

---

**47.** It speaks well for counsel, however, that despite the existence of this recommendation from the Special Masters, they argued strenuously for an increase in the fee recommended for Dr. Cohen by the Special Masters. They recognized that such an increase would in fact reduce their own fee if the Special Masters' other recommendation were followed by the Court, yet they felt "honor bound" to advocate approval of their contract with Dr. Cohen. Tr. at 10 (May 27, 1983).

**48.** *See* pp. 795–796, *supra.*

of the total recovery to date. *See* Tables 6 and 7. This is substantially greater than the 10 to 15 percent unpersuasively urged by the government as a measure. It is substantially less than what counsel would have earned if the Court had meticulously applied *Copeland* standards.

If the Court's only responsibility were to the minor plaintiffs, it might be required to award only the barest minimum fee, and to make the entire balance available to the individual plaintiffs. For example, if the Court adopted the government's argument, plaintiffs' counsel would receive only $1,350,000—$2,022,000, less the fees already paid to them. The defendant and the government may well be intent on discouraging attorneys from taking the risks and performing the services performed by these counsel here. But if that is the policy of defendant and the United States, it is not the policy of justice. In fact, the injustice of the imbalance of resources available to the parties and their counsel here was manifest and very disturbing. It is important that these infants enjoy as much of the fruits of this settlement as possible. It is also important that lawyers who are willing to take personal risks on behalf of such clients be encouraged in the future to take the risk of advocating the just claims of the weak, the helpless, and the young, and that such claimants have something like the access to counsel and the judicial process that is available to the government and affluent corporations. The fee awarded here should serve to compensate counsel for their service to their clients and the risks that they encountered, and to frustrate any effort by defendant and others to discourage other lawyers from challenging the juggernaut when the occasion arises.

## VIII. Accrued Interest

■ The funds received from the global settlement have now been in the Registry of the Court for several months and have earned a significant amount of interest.[49] Various parties have submitted to the Court a number of proposals for allocation of this interest. The Court finds that the most just solution for this problem is to disburse the accrued interest on the same basis as that used for the principal. A proportionate amount of the accrued interest should therefore be allocated to the individual plaintiffs, to the attorneys' and guardians' fees and expenses, to the Central Trust, and to repayments to individual settlements (*see* Tables 8, 9, and 12).

There is one exception to this allocation of interest, however. The Special Masters performed their task on a *pro bono* basis and have requested no fee, despite the fact that they and their two firms devoted 683 hours to this case. However, they have submitted a statement of their expenses for transcripts, transportation, postage and other incidentals. Those expenses totalled $2,061.09. At a meeting with the Court on April 28, 1983, at which the subject of their expenses was first raised, the Special Masters indicated a reluctance to press for payment of these expenses if they would "come out of the children's fund," and in their letter to the Court giving their statement of expenses on May 20, they reiterated their recognition that such repayment might not be possible.

The need to appoint the Special Masters arose in great part from the inability of plaintiffs' counsel and the guardians *ad litem* to submit a full accounting and allocation of the litigation expenses upon which the Court could reasonably rely. It is appropriate, therefore, for counsel and the guardians to bear the burden of this relatively minor expense. Accordingly, the share of accrued interest allocable to the guardians and counsel will be reduced by $2,061.09,[50] and disbursements will be made in the amounts of $931.80 to Arnold & Porter and $1,129.29 to Rogovin, Huge & Lenzner.

---

**49.** As of May 25, 1983, the total interest accrued exceeded $464,000.

**50.** This deduction should be shared equally by counsel and the guardians.

## IX. Conclusion

The tireless and highly professional efforts of plaintiffs' counsel and the guardians *ad litem* have yielded recoveries totalling $17,453,608.90 in 51 settled cases. After all the payments authorized by this Memorandum have been made, the plaintiffs will have received approximately $10,252,546.57, or 58.7417% of the total recovery, plus interest. Plaintiffs' counsel will have received $4,212,637.95, or 24.1362% of the total recovery, plus interest. $2,218,153.73, or 12.7089%, plus interest, will have been paid or set aside for litigation expenses (including the fee of Dr. Cohen),[51] while $770,-268.69, or $4.4132% of the total recovery will, plus interest, have been paid to Mr. Work and his law firms for their fees and expenses incurred as *amicus curiae* and guardians *ad litem*.[52] Overall, a total of 40.2583% of the total recovery will have been paid for fees and expenses. The balance has been or will be disbursed for the direct benefit of the plaintiffs themselves.

Counsel and the guardians had originally requested a total of 50% of the global settlement recovery for their fees and expenses. By this Memorandum, the Court is authorizing payment of approximately 41% of the recovery of $13,500,000 for fees and expenses: $3,258,387.00, or 24.1362% for attorney fees, $1,686,703.50, or 12.4941% for litigation expenses, and $618,492.15, or 4.5083% for the fees and expenses of the guardians *ad litem*. This leaves more than $1,100,000 in funds that are now available for the direct benefit of the plaintiffs, in addition to the $4,500,000 in individual distributions and $2,250,000 in funds for the central trust that have already been authorized, a total of approximately $7,850,000. The Court has considered paying this additional amount of $1,100,000 into the central trust. However, it seems more likely that these funds would be of more certain and direct benefit to these plaintiffs if distributed directly to their locally appointed guardians.

The exact amounts and sources for the fees and expenses authorized in this Memorandum are calculated in Tables 2 through 12. The Court will be prepared, on a future "window date" to sign appropriate Orders disbursing from the global settlement the amounts listed in Table 12, with interest.[53] In addition, the guardians *ad litem* should submit proposed Orders authorizing disbursement of all amounts still in the Registry from the settlements of *Marchetti, Wright, Reynolds, Casper, Bosi,* and *Otto* directly to those plaintiffs under the conditions the Court has previously established in those cases.

TABLE 1: RECOVERIES IN SURVIVING INFANT CASES BEFORE GLOBAL SETTLEMENT

Figures are without interest

| CASE | TOTAL RECOVERY | TO PLAINTIFF | ATTORNEY FEES | EXPENSES | GUARDIANS AD LITEM | REMAINDER IN REGISTRY |
|---|---|---|---|---|---|---|
| Schneider (J) * | 189,512.14 | 63,171.34 (33⅓%) | 63,170.40 (33⅓%) | 63,170.40 (33⅓%) | 0 | 0 |
| Zimmerly (J) | 158,095.95 | 52,698.65 (33⅓%) | 52,698.65 (33⅓%) | 52,698.65 (33⅓%) | 0 | 0 |
| Marchetti (J) | 367,668.81 | 122,556.27 | 122,556.27 | 122,556.27 | 0 | 0 |

**51.** At the hearing on May 27, 1983, plaintiffs' counsel indicated that they had incurred some additional out of pocket expenses since August 31, 1982, primarily for travel and other minor items required for the post-settlement proceedings. The substantial amount of accrued interest allocated to counsel should be more than sufficient to cover these additional expenses.

**52.** The guardians have received an additional $156,278.71 in partial judgment recoveries from defendants. *See* Memorandum of March 11, 1983, at 19 n. 19.

**53.** The total amount authorized for all fees and expenses will be paid to the guardians *ad litem* with instructions to allocate it as directed by this Memorandum.

TABLE 1: RECOVERIES IN SURVIVING INFANT CASES BEFORE GLOBAL SETTLEMENT

Figures are without interest

| CASE | TOTAL RECOVERY | TO PLAINTIFF | ATTORNEY FEES | EXPENSES | GUARDIANS AD LITEM | REMAINDER IN REGISTRY |
|---|---|---|---|---|---|---|
| Marchetti (S) | 478,332.00 | 300,571.51 (50%) | 132,443.73 (30.1%) | 0 (14.5%) | 27,820.74 (3.3%) | 17,496.02 |
| Wright (S) | 995,000.00 | 529,300.00 (53.2%) | 300,000.00 (30.2%) | 99,000.00 (9.9%) | 33,350.00 (3.4%) | 33,350.00 |
| Reynolds (S) | 855,000.00 | 454,138.00 (53.1%) | 258,000.00 (30.2%) | 85,500.00 (10.0%) | 28,681.00 (3.4%) | 28.681.00 |
| Casper (S) | 295,000.00 | 150,000.00 (50.8%) | 90,000.00 (30.5%) | 29,500.00 (10.0%) | 10,005.00 (3.4%) | 15,495.00 |
| Bosi (S) | 295,000.00 | 150,000.00 (50.8%) | 90,000.00 (30.5%) | 29,500.00 (10.0%) | 10,005.00 (3.4%) | 15,495.00 |
| Otto (S) | 320,000.00 | 162,500.00 (50.8%) | 97,500.00 (30.5%) | 32,000.00 (10.0%) | 10,838.75 (3.4%) | 17,161.25 |
| Total | 3,953,608.90 | 1,984,935.80 (50.2%) | 1,206,369.10 (30.5%) | 513,925.32 (13.0%) | 120,700.49 (3.1%) | 127,678.27 |

\* (J) = Partial Judgment
(S) = Settlement

TABLE 2: ALLOCATION OF GUARDIAN AD LITEM FEES BY CASE CATEGORY

| CATEGORY | GLOBAL SETTLEMENT | ALL SETTLED CASES | INDIVIDUAL SETTLEMENTS |
|---|---|---|---|
| 1. Court Appearances | | $ 48,525.68 | |
| 2. Contacts with parents | | $103,334.65 | |
| 3. Settlement negotiations | | $ 69,860.77 | |
| 4. Global Settlement | $ 30,982.57 | | |
| 5. Global Settlement Aftermath | $154,448.76 | | |
| 6. Fund | | $204,726.26 | |
| 7. Legal Issues | | $350,465.90 | $25,083.08 |
| Totals | $185,431.33 x .95 | $776,913.26 x .95 | $25,083.08 x .95 |
| Total fee allowed | $176,159.76 | $738,067.26 | $23,828.93 |
| Minus payments from defendants and abandoned claims | | $178,951.55 | |
| Total fee to be paid by settling plaintiffs | $176,159.76 | $559,116.03 | $23,828.93 |
| Share of recovery | 1.3049% | 3.2034% | 0.6027% |

Total Share of Global Settlement: 4.5083%

Total Share of Individual Settlements and Partial Judgments: 3.8061%

TABLE 3: ALLOCATION OF GUARDIAN AD LITEM FEES BY CASE

| CASE | SHARE | PAID | DUE |
|---|---|---|---|
| Schneider (J only) | $ 7,213.02 | 0 | $7,213.02 |
| Zimmerly (J only) | $ 6,017.29 | 0 | $6,017.29 |
| Marchetti (J + S) | $32,199.64 | $27,820.74 | $4,378.90 |
| Wright | $37,870.69 | $33,350.00 | $4,520.69 |
| Reynolds | $32,542.16 | $28,681.00 | $3,861.16 |
| Casper | $11,228.00 | $10,005.00 | $1,223.00 |

### TABLE 3: ALLOCATION OF GUARDIAN AD LITEM FEES BY CASE

| CASE | SHARE | PAID | DUE |
|------|-------|------|-----|
| Bosi | $11,228.00 | $10,005.00 | $1,223.00 |
| Otto | $12,179.52 | $10,838.75 | $1,340.77 |
| Global Settlement (each) | $608,620.50 ($13,524.90) | $592,917.78 ($13,175.95) | $15,702.72 ($348.95) |
| Total | $759,098.82 | $713,618.27 | $45,480.55 |

(J) = Partial Judgment
(S) = Settlement

### TABLE 4: AMICUS FEES

| | |
|--|--|
| Total Amicus Fees for 115 Plaintiffs | $25,227.49 |
| Share per plaintiff: | $ 219.37 |

| CASE | SHARE OF AMICUS FEE |
|------|---------------------|
| Marchetti | $ 219.37 |
| Wright | $ 219.37 |
| Reynolds | $ 219.37 |
| Casper | $ 219.37 |
| Bosi | $ 219.37 |
| Otto | $ 219.37 |
| Global Settlement (45 plaintiffs) | $9,871.65 |
| Total | $11,187.87 |

### TABLE 5: CALCULATION OF FEE FOR DR. COHEN

(Based Upon Second Contract)

| | |
|--|--|
| Thirty-six months at $6,500/month | $234,000.00 |

| | |
|--|--|
| Two percent of total recovery * | $355,072.18 |
| Total fee for all cases | $589,072.18 |
| Total fee for foreign cases (21.9%) | $129,006.81 |
| Total fee for 52 American cases | $460,065.37 |

*Including 2% of $300,000 allocated to *Kurth.* *See* note 26, *supra.*

### TABLE 6: SHARE OF FEES AND EXPENSES AS PERCENTAGE OF RECOVERY

| | SETTLEMENTS AND PARTIAL JUDGMENTS | GLOBAL SETTLEMENT |
|--|-----------------------------------|-------------------|
| Attorney fees | 24.1362% | 24.1362% |
| Dr. Cohen | 2.5914% | 2.5914% |
| Litigation expenses | 9.9027% | 9.9027% |
| Guardian *ad litem* | 3.8061% | 4.5083% |
| Total | 40.4364% | 41.1386% |
| *Amicus* fees | $219.37 each | $219.37 each |

TABLE 7: ACTUAL SHARE OF FEES AND EXPENSES

| CASE | TOTAL RECOVERY | ATTORNEY FEES | DR. COHEN | EXPENSES | GUARDIANS | AMICUS |
|---|---|---|---|---|---|---|
| Schneider (G + J) | $489,512.14 | $118,149.63 | $12,685.22 | $48,474.92 | $20,737.92 | $219.37 |
| Zimmerly (G + J) | $458,095.95 | $110,566.95 | $11,871.10 | $45,363.87 | $19,542.19 | $219.37 |
| Marchetti (S + J) | $846,000.81 | $204,192.45 | $21,923.27 | $83,776.92 | $32,199.64 | $219.37 |
| Wright (S) | $995,000.00 | $240,155.19 | $25,784.43 | $98,531.87 | $37,870.69 | $219.37 |
| Reynolds (S) | $855,000.00 | $206,364.51 | $22,156.47 | $84,668.09 | $32,542.16 | $219.37 |
| Casper (S) | $295,000.00 | $71,201.79 | $7,644.63 | $29,212.97 | $11,228.00 | $219.37 |
| Bosi (S) | $295,000.00 | $71,201.79 | $7,644.63 | $29,212.97 | $11,228.00 | $219.37 |
| Otto (S) | $320,000.00 | $77,235.84 | $8,292.48 | $31,688.64 | $12,179.52 | $219.37 |
| 43 other global settlement plaintiffs (G) | $12,900,000.00 ($300,000.00) | $3,113,569.80 ($72,408.60) | $334,290.60 ($7,774.20) | $1,277,448.30 ($29,708.10) | $581,570.70 ($13,524.90) | $9,482.91 ($219.37) |
| (Kurth) | 0 (assume $300,000.00)* | — | $7,774.20 | $29,708.10 | — | — |
| Totals | $17,453,608.90 | $4,212,637.95 | $460,067.03 | $1,758,086.70 | $759,098.82 | $11,187.87 |

(S) = Settlement
(J) = Judgment
(G) = Global Settlement

* See p. 27, supra.

TABLE 8: AMOUNTS DUE IN FEES
AND EXPENSES

**Attorney Fees**

| | |
|---|---|
| Total Allowed | $4,212,637.95 |
| Amounts received from individual settlements and partial judgments | $1,206,369.10 |
| | $3,006,268.85 |

| | |
|---|---|
| Interim payments authorized from global settlement | $1,350,000.00 |
| Remainder | $1,656,268.85 |

**Litigation Expenses**

| | |
|---|---|
| Total allowed for American cases | $2,018,080.24 |
| Amounts received pursuant to 1979 stipulation ($5,000 x 52) | $ 260,000.00 |
| | $1,758,080.24 |

### TABLE 8: AMOUNTS DUE IN FEES AND EXPENSES

**Litigation Expenses**

| | |
|---|---|
| Amounts received from individual settlements and partial judgments | $ 513,925.32 |
| | $1,244,154.92 |
| Interim payments from global settlement | $ 810,000.00 |
| | $ 434,154.92 |
| Amount allocable to *Kurth* | $ 29,708.10 |
| Remainder | $ 404,446.82 |

**Dr. Cohen's Fee**

| | |
|---|---|
| Total allowed from American cases | $ 460,067.03 |
| Amount allocable to *Kurth* | $ 7,774.20 |
| Remainder | $ 452,292.83 |

**Guardian Ad Litem Fees and Expenses**

| | |
|---|---|
| Total allowed | $ 759,098.82 |
| Amount received from individual settlements and partial judgments | $ 120,700.49 |
| | $ 638,398.33 |
| Interim payments authorized from global settlement | $ 592,917.78 |
| | $ 45,480.55 |

**Amicus Fees**

| | |
|---|---|
| Total allowed for 51 cases | $ 11,187.87 |
| Amount received | 0 |
| Remainder | $ 11,187.87 |
| Total fees and expenses now due: | $2,569,676.92 |

### TABLE 9: AMOUNTS DUE BY CASE

I. Schneider (G + J)

| | |
|---|---|
| Total share of fees and expenses | $200,267.06 |
| Paid | $187,516.75 |
| Due | $ 12,750.31 |

II. Zimmerly (G + J)

| | |
|---|---|
| Total share of fees and expenses | $187,563.48 |
| Paid | $166,573.25 |
| Due | $ 20,990.23 |

III. Other 43 global settlement plaintiffs

| | |
|---|---|
| Total share of fees and expenses (each) | $123,635.17 |
| Paid (each) | $ 61,175.95 |
| Due (each) | $ 62,459.22 |
| | x 43 |
| Total due from 43 plaintiffs | $2,685,746.46 |

IV. Marchetti

| | |
|---|---|
| Total share | $ 342,311.65 |
| Paid | $ 405,377.01 |
| Overpayment | $ 63,065.36 |

V. Wright

| | |
|---|---|
| Total share | $ 402,561.55 |
| Paid | $ 432,350.00 |
| Overpayment | $ 29,788.45 |

VI. Reynolds

| | |
|---|---|
| Total share | $ 345,950.60 |
| Paid | $ 372,181.00 |
| Overpayment | $ 26,230.40 |

VII. Casper

| | |
|---|---|
| Total share | $ 119,506.76 |
| Paid | $ 129,505.00 |
| Overpayment | $ 9,998.24 |

VIII. Bosi

| | |
|---|---|
| Total share | $ 119,506.76 |
| Paid | $ 129,505.00 |
| Overpayment | $ 9,998.24 |

X. Otto

| | |
|---|---|
| Total share | $ 129,615.85 |
| Paid | $ 140,338.75 |
| Overpayment | $ 10,722.90 |
| Total Due | $2,569,683.31 |

### TABLE 10: ALLOCATION OF GLOBAL SETTLEMENT

| | | |
|---|---|---|
| Total recovery | | $13,500,000.00 |
| Individual distributions to plaintiffs | | $ 4,500,000.00 |
| | | $ 9,000,000.00 |
| Central Trust | | $ 2,250,000.00 |
| | | $ 6,750,000.00 |
| Share of fees and expenses | | |
| Total share | $5,563,582.65 | |
| Credit for Schneider and Zimmerly * | $ 91,177.90 | |
| | | $5,472,404.75 |
| | | $1,277,595.25 |
| Set-aside for *Kurth* expenses | | $ 37,482.30 |
| | | $1,240,112.95 |
| Set-aside for guardians ** | | $ 133,566.92 |
| Remainder | | $1,106,546.03 |

\* This amount of Schneider's and Zimmerly's shares of fees and expenses allocable to the global settlement was actually paid from their partial judgments ($49,708.91 for Schneider; $41,468.99 for Zimmerly). A proportionately larger share of the Remainder is therefore allocable to those two plaintiffs.

\*\* In its Memorandum of March 11, 1983, the Court authorized a set-aside of $150,000 from the global settlement for the guardian *ad litem*. Of that amount, $15,702.72 is authorized in this Memorandum as a further payment for the period ending December 31, 1982. The balance will be held available to pay fees and expenses of the guardians incurred on behalf of these plaintiffs in 1983.

### TABLE 11: ALLOCATION OF GLOBAL SETTLEMENT REMAINDER

| | |
|---|---|
| Total Remainder after payment of fees and expenses, individual disbursements, central trust, and set asides | $1,106,546.03 |
| Credit to Schneider and Zimmerly (*see* Table 10) | $ 91,177.90 |
| Adjusted remainder | $1,015,368.13 |
| Share of each of 45 plaintiffs | $ 22,563.74 |

TABLE 12: ACTUAL PAYMENTS TO BE MADE FROM GLOBAL SETTLEMENT

| | | |
|---|---|---|
| 1. | To Guardians Ad Litem for payments of attorney fees, litigation expenses, and guardians' fees and expenses | $2,569,683.31 * |
| 2. | To Marchetti for overpayment of fees ** | $ 63,065.36 |
| 3. | To Wright for overpayment of fees | $ 29,788.45 |
| 4. | To Reynolds for overpayment of fees | $ 26,230.40 |
| 5. | To Casper for overpayment of fees | $ 9,998.24 |
| 6. | To Bosi for overpayment of fees | $ 9,998.24 |
| 7. | To Otto for overpayment of fees | $ 10,722.90 |
| 8. | To Schneider<br>Share of Remainder $22,563.74<br>Overpayment of fees $49,708.91 | $ 72,272.65 |
| 9. | To Zimmerly<br>Share of Remainder $22,563.74<br>Overpayment of fees $41,468.99 | $ 64,032.73 |
| 10. | To other 43 global settlement plaintiffs ($22,563.74 each) | $ 970,240.82 |
| | Total payments | $3,826,033.10 |

* Of the accrued interest allocated to this item, $2,061.09 should be deducted and paid to the Special Masters. *See* pp. 59–60, *supra*.

** To simplify the transfer of funds, the overpayments from the individual settlements will be reimbursed directly from the global settlement instead of paid to the attorneys, etc. from the global settlement and then paid by them to the individual settlement plaintiffs.